UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
In the Matter of the Trusteeships Created
by Tropic CDO I Ltd. and Tropic CDO I
Corp.; Tropic CDO II Ltd. and Tropic CDO
II Corp.; Tropic CDO III Ltd. and Tropic
CDO III Corp.; Tropic CDO IV Ltd. and
Tropic CDO IV Corp.; Soloso CDO 2005-1
Ltd. and Soloso CDO 2005-1 Corp.; and
Soloso CDO 2007-1 Ltd. and Soloso CDO
2007-1 Corp.
----------------------------------------X

**MEMORANDUM AND ORDER**

13 Civ. 8428 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

The three parties to this consolidated action call upon the Court to interpret provisions in the trust indentures that govern six collateralized debt obligations ("CDOs"). One interpretation is jointly advanced by the CDOs' trustee, Wells Fargo Bank, N.A. ("Wells Fargo" or the "Trustee"), and by HRUN LLC ("HRUN"), a noteholder in three of the CDOs; a contrary interpretation is advanced by Zions Bancorporation ("Zions"), a noteholder in at least three of the CDOs that alleges that it has received insufficient distributions from the Trustee with respect to one of the CDOs as a result of the Trustee's application of its misinterpretation of the relevant indentures. Each party, arguing that the contested terms of the indentures are unambiguous as a matter of law, moves for judgment on the pleadings. For the reasons that follow, the Zions motion is granted in part and denied in part, and the Wells Fargo and HRUN motions are denied.

## I.  BACKGROUND[1]

The parties agree that their motions turn on the interpretation of the CDO indentures annexed to the pleadings, the contents of which are not in dispute.  Although the six indentures are not identical, the parties further agree that the differences among them are immaterial for present purposes.  We follow the lead of the Trustee and Zions in focusing on the terms of the April 23, 2003 indenture for the "Tropic I" CDO, which we shall call the "Indenture."[2]

## A.  The Senior Overcollateralization Test and Related Provisions

The parties' dispute centers on a subordination feature, known as the "Senior Overcollateralization Test," which is found in the indentures governing the six CDOs involved in this litigation.  As discussed in greater detail in Part I.B below, Zions, which owns $78 million in junior notes issued by Tropic I, contends that in 2011-2012 the Trustee, misinterpreting the Senior Overcollateralization Test, paid Tropic I's senior

---

[1] In addition to terms defined in the main text, citations refer to the Verified Petition dated September 30, 2013 ("Petition" or "Pet."); the Trustee's memorandum of law dated May 23, 2014, Doc. 44 ("Trustee Br."); HRUN's memorandum of law dated May 23, 2014, Doc. 47 ("HRUN Br."); the Declaration of Richard J. Bettan, Esq., dated May 23, 2014, Doc. 48 ("Bettan Decl."), and exhibits thereto; Zions' memorandum of law dated May 23, 2014, Doc. 51 ("Zions Br."); Zions' memorandum of law dated June 20, 2014, Doc. 58 ("Zions Reply Br."); and other documents filed in this Court or the U.S. District Court for the District of Minnesota by document number ("Doc. __").

[2] The Indenture is annexed to the Petition as Exhibit 1.

noteholders approximately $5 million in distributions that should have been paid to Zions instead. The Trustee, joined by HRUN (a noteholder in three of the CDOs, but not Tropic I), defends the amounts it distributed on the basis of its "dynamic" interpretation of the Senior Overcollateralization Test.

In the CDO transactions, special purpose vehicles called issuers issued notes to investors. The proceeds of the issuance were used to acquire portfolios of collateral, such that returns on the collateral are to be used to make interest and principal payments to the noteholders. Zions Br. at 2-3; Trustee Br. at 1. The notes were issued in classes of various seniority; in general, more senior notes had a lower interest rate but a higher priority of payment than more junior notes. Trustee Br. at 1; Zions Br. at 3. Pursuant to the indentures, the Trustee is responsible for making quarterly payments to noteholders, to the extent that funds are available. The order and priority of payments to the various classes of noteholders is established by a mechanism known to the parties as a "payment waterfall" or "waterfall." At certain steps in the waterfall, tests including the so-called "Interest Coverage Tests" and "Overcollateralization Tests" can affect the amounts to be paid to different classes of noteholders.

The Senior Overcollateralization Test, which is the subject of the instant dispute, is one of the Overcollateralization

Tests.    It  is  undisputed  that  the  purpose  of  the  Senior
Overcollateralization  Test  is  to  protect  senior  noteholders
against  the  risk  of  default  from  a  decline  in  the  value  of  the
CDO's  collateral,  and  that  it  serves  that  purpose  by  requiring
the  Trustee  to  redeem  a  quantity  of  senior  notes  when  the  ratio
of  the  value  of  collateral  to  the  value  of  outstanding  senior
notes  falls  below  a  constant  ratio  defined  by  the  CDO's
indenture.   See Trustee Br. 20; HRUN Br. 8; Zions Ans. ¶ 17.

Section  11.1  of  the  Indenture,  which  is  entitled
"Disbursements  of  Monies  from  Collection  Account,"  specifies  the
steps  of  the  payment  waterfall.   Section  11.1  provides,  in
relevant part:

> [D]isbursements  of  monies  from  the  Collection
> Account  shall  be  made  at  the  following  times  and  in
> the  following  order  of  priority:  .  .  .  .
>
> (c)   On  each  Payment  Date,  .  .  .  in  accordance
> with  the  Note  Valuation  Report  for  the  Calculation
> Date  immediately  preceding  such  Payment  Date,  the
> Trustee  shall  withdraw  from  the  Collection  Account  (to
> the  extent  of  the  available  funds  therein  .  .  .  )  an
> amount   .  .  .   and   shall   make   the   following
> disbursements:
>
> (i)   The  Trustee  shall  apply  the  Available
> Adjusted  Collateral  Interest  Collections  (to  the
> extent  of  available  funds  therefor)  in  the  following
> order  of  priority:  .  .  .
>
> THIRD:  **To  the  payment  of  principal  as
> an O/C Redemption  in  the  amount,  if  any,  required  to
> be  paid  in  order  to  satisfy  the  Senior
> Overcollateralization  Test**  and  the  Senior  Interest
> Coverage  Test,  such  amount  to  be  paid  in  the  following
> order:  first,  to  the  Class  A-1L  Notes,  second,  to  the

> Class A-2L Notes, and, third, to the Class A-3L Notes until each such Class is paid in full; . . . .
>
>     (ii)   On each Payment Date, . . . the Trustee shall apply the Available Adjusted Collateral Principal Collections (to the extent of available funds therefor) in the following order of priority:
>
>         FIRST:  To the payment of the amounts described in clauses FIRST through SIXTH in Section 11.1(c)(i) hereof, in the order described therein, in each case to the extent that the amounts paid pursuant to clauses FIRST through SIXTH in Section 11.1(c)(i) hereof are insufficient to pay such amounts; . . . .

Indenture § 11.1, at 84-77 (emphasis added).  The parties' dispute turns on the meaning of the phrase "an O/C Redemption in the amount, if any, required to be paid in order to satisfy the Senior Overcollateralization Test" in Section 11.1(c)(i)THIRD. If too much money is paid to holders of Class A-1L, A-2L, and A-3L Notes (the "Senior Class A Noteholders" or "Senior Noteholders") pursuant to Section 11.1(c)(i)THIRD (and pursuant to Section 11.1(c)(ii)FIRST, which incorporates Section 11.1(c)(i)THIRD by reference), then not enough may be available to make payments to more junior noteholders.

    Other provisions of the Indenture are relevant to this dispute.  Section 9.2, which is entitled "Mandatory Redemption," provides, in relevant part:

>     If either the Interest Coverage Tests or the Overcollateralization Tests are not satisfied as of any applicable Calculation Date . . . , all or a portion of the Notes shall be redeemed . . . by the Issuer, in the order set forth in Section 11.1 hereof, on the Payment Date immediately following such Calculation Date . . . in an amount sufficient such

> that the Interest Coverage Tests and the
> Overcollateralization Tests are satisfied . . . . The
> amount of any Mandatory Redemption hereunder shall be
> determined in accordance with the provisions of
> Section 11.2 hereof.

Indenture § 9.2, at 73.   Section 11.2, in turn, which is entitled "Mandatory Redemptions with Respect to Overcollateralization Tests and Interest Coverage Tests and Rating Confirmation Failure," provides in relevant part:

> On any Payment Date with respect to which an
> Overcollateralization Test or an Interest Coverage
> Test (as calculated in the Note Valuation Report for
> the Calculation Date immediately preceding such
> Payment Date) would not be met (but for this Section
> 11.2) . . ., **the Issuer shall redeem the Notes . . .
> in the order described in Section 11.1 hereof pursuant
> to Section 9.2 hereof, and the Trustee shall pay
> the Holders thereof (to be applied against the
> principal amount thereof) from the available amount in
> the Collection Account and pursuant to the applicable
> provisions of Section 11.1 hereof, an aggregate amount
> necessary to cause each of the Overcollateralization
> Tests** and each of the Interest Coverage Tests **to be
> met** . . . .

Indenture § 11.2, at 88 (emphases added).

The Indenture's definitions of several terms, as set out in Section 1.1 ("Definitions"), are also particularly relevant. The "Senior Overcollateralization Test" is defined as:

> With respect to any date of determination, a test
> met when the Senior Overcollateralization Ratio is at
> least equal to 106% relating to such date of
> determination.

Indenture § 1.1, at 21.[3]   The "Senior Overcollateralization Ratio" is defined in relevant part as:

> With respect to a determination made as of any Calculation Date, the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral (other than the Defaulted Portfolio Collateral) in the Trust Estate as of such Calculation Date *plus* (2) Collateral Principal Collections held as cash in the Collection Account as of such Calculation Date and the balance of Eligible Investments purchased with Collateral Principal Collections *plus* (3) 2% of the aggregate Principal Balance of all the Defaulted Portfolio Collateral in the Trust Estate as of such Calculation Date by (b) the sum of the Aggregate Principal Amount of the Senior Class A Notes . . . as of such Calculation Date.

Indenture § 1.1, at 21 (italics in original).   An "O/C Redemption" is defined in relevant part as:

> The redemption of a Class or Classes of Notes . . . to the extent necessary such that the Overcollateralization Tests and the Interest Coverage Tests are satisfied, such test to be calculated according to the method prescribed by <u>Annex A</u>.

Indenture § 1.1, at 15 (underlining in original).

Additionally, Annex A, which is entitled "Methodology for Calculating the Amount of an O/C Redemption," provides, in relevant part:

> For any Payment Date with respect to which one or more of the Overcollateralization Tests are not satisfied, the amount (the "<u>O/C Redemption Amount</u>") of

---

[3] The ratio that causes the Senior Overcollateralization Test to fail differs among the six CDOs.  For instance, as shown in the main text, that percentage is 106% for Tropic I, but it is 115% for the CDO known as "Soloso 2005-1."  Bettan Decl. Ex. 1, at 26.  As noted above, it is the parties' consensus that such distinctions among the indentures do not, for present purposes, make a difference.

Available Adjusted Collateral Interest Collections or Available Adjusted Collateral Principal Collections (as applicable) to be applied to the payment of principal of the Notes as an O/C Redemption (pursuant to the relevant clause of Section 11.2 of the Indenture) in order to satisfy such Overcollateralization Test(s) shall be calculated by the Trustee according to the following formulas:

With respect to the Senior Overcollateralization Test:

O/C Redemption Amount = L − (A / R)

. . . .

For purposes of applying the foregoing formula:

(a)   <u>Senior Class A Note O/C Test Redemptions</u>.   In connection with an O/C Redemption required to satisfy the Senior Overcollateralization Test relating to the Senior Class A Notes:

"<u>L</u>" (for "liabilities") shall be the Aggregate Principal Amount of the Senior Class A Notes . . . as of the related Calculation Date;

"<u>R</u>" shall be the required Senior Overcollateralization Ratio equal to 106%; and

"<u>A</u>" (for "assets") shall be the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of the related Calculation Date *plus* (2) the sum of the Balance of Eligible Investments and cash in the Collection Account representing Collateral Principal Collections.

Indenture Annex A, at B-1 (italics and underlining in original). The parties call the method specified in Annex A the "Annex A Calculation" or "Annex A Formula."

Finally, the Indenture sets up a distinction between "Calculation Dates" and "Payment Dates."   In general,

Calculation Dates and Payment Dates occur quarterly on fixed dates, with each Calculation Date preceding its associated Payment Date by approximately eight days.[4]

## B.  Failures of the Senior Overcollateralization Test

According to the identical petitions filed by the Trustee in each of the six consolidated cases, the dispute between the Trustee and Zions as to Tropic I arose as follows:

> 16.  **On each of the Disputed Payment Dates (as defined below), the Senior Overcollateralization Test was failing and, therefore, the Trustee applied Sections 9.2, 11.1(c)(i)THIRD, 11.1(c)(ii)FIRST, and 11.2.** Application of these provisions on each Disputed Payment Date required that the Trustee distribute the Available Adjusted Collateral Interest Collections and Available Adjusted Collateral Principal Collections to certain Class A Noteholders to redeem a portion of the outstanding principal of the senior Notes. While the redemption of Class A Notes increased the Overcollateralization Ratio on each of the Disputed Payment Dates, the Available Adjusted Collateral Interest Collections and Available Adjusted Collateral Principal Collections on the underlying pool of Collateral on each such date were insufficient to cause the Senior Overcollateralization Test to be satisfied. **Redemption of the Class A Notes on each of the Disputed Payment Dates left no amounts available for distribution to Holders of the junior Class A-4L Notes, Class A-4 Notes and Class B-1L Notes.**

---

[4] More specifically, and with details and exceptions not relevant here, a Payment Date is defined as "[t]he 15th day of January, April, July and October of each calendar year," Indenture § 1.1, at 17; a Calculation Date is defined as "[t]he last day of each Due Period," Indenture § 1.1, at 5; and a Due Period is defined as, "[w]ith respect to any Payment Date, the period beginning on the day following the last day of the immediately preceding Due Period . . . and ending at the close of business on the seventh day of the calendar month in which such Payment Date occurs," Indenture § 1.1, at 10.

**17. . . . Zions**, a Holder . . . of Class A-4L Notes, Class A-4 Notes and B-1L Notes . . . . **asserted that the Trustee incorrectly allocated funds pursuant to the Tropic I Indenture on the Payment Dates occurring in October 2011, January 2012 and October 2012 (the "Disputed Payment Dates")** because Zions' Class A-4L Notes, Class A-4 Notes and B-1L Notes were not paid any interest. **Zions claimed that it should have received interest payments in the aggregate amount of $4,931,044.90 in respect of its subordinate Notes, which amounts were instead paid to the Holder(s) of the then most senior Class A Notes to redeem a portion of such Notes.**

Pet. ¶¶ 16-17 (emphases added and footnote omitted). Thus, as to Tropic I, the issue is whether the Trustee's interpretation of the Senior Overcollateralization Test and related provisions of the Indenture incorrectly led it to redeem an excessive amount (in the approximate amount of $5 million) of notes held by the Senior Noteholders, leaving insufficient funds available to make payments due to Zions, a junior noteholder. As described in Part II.A below, the decisive question is whether the Trustee's "dynamic" approach to calculating the amount of O/C Redemptions is authorized by the Indenture.[5]

The Trustee alleges (and no party disputes) that the other CDOs "have relevant indenture terms that are identical in all material respects" to those involved in the Tropic I CDO. Pet. ¶ 28. With respect to the two CDOs called "Tropic III" and

---

[5] Although the entire collateral of Tropic I has since been liquidated, and many of the proceeds of liquidation have been distributed to noteholders, the Trustee has held back certain proceeds of the liquidation in anticipation of judicial resolution of certain issues, including the instant dispute concerning the Senior Overcollateralization Test. Pet. ¶¶ 26-27.

"Soloso 2005-1," the Trustee alleges that on Payment Dates when the Senior Overcollateralization Test was failing, the Trustee applied the same "dynamic" approach as it applied with respect to Tropic I.  Pet. ¶¶ 32, 36.  Unlike with Tropic I, however, no Tropic III or Soloso 2005-1 noteholder has challenged the Trustee's interpretation of the Senior Overcollateralization Test and related provisions.  Pet. ¶¶ 33, 37.

The three remaining CDOs in suit are called "Tropic II," "Tropic IV," and "Soloso 2007-1."  With respect to these CDOs, the Trustee alleges that on Payment Dates when the Senior Overcollateralization Test was failing, "the amounts to be distributed from the available collections have been insufficient to satisfy the distribution amount required by a single Annex A Calculation."  Pet. ¶¶ 40, 44, 48.  As a result, the Trustee has not been presented with the opportunity to apply the Annex A Calculation dynamically.  However, if on a future Payment Date sufficient collections become available for distribution, "the Trustee will be required to construe Sections 9.2, 11.1, and 11.2 of the [relevant indentures], as well as the definition of 'O/C Redemption' and the Annex A Calculation."  Pet. ¶¶ 40, 44, 48.

## C.   Procedural History

The instant litigation began on September 30, 2013, when the Trustee filed six identical verified petitions for trust instructions in Minnesota state court, pursuant to a Minnesota statute that authorizes a trustee to petition for a court order:

> (1) to confirm an action taken by a trustee; . . .

> (4) to construe[ or] interpret . . . the terms of a trust . . . ; [or] . . .

> (23) to instruct the trustee, beneficiaries, and any other interested parties in any matter relating to the administration of the trust and the discharge of the trustee's duties

Minn. Stat. § 501B.16.   In these petitions, the Trustee seeks "entry of an order confirming that (a) it has correctly interpreted the relevant terms in each indenture pertaining to distribution of principal and interest proceeds following the failure of an overcollateralization test; and (b) in those instances where there has been an overcollateralization test failure, it has properly distributed interest proceeds to investors."   Pet. ¶ 6; see id. WHEREFORE ¶ c(i).   The Trustee also seeks judicial approval of "payment from the [CDOs] of any fees and expenses incurred by the Trustee" in connection with the petitions.   Id. ¶ 50; see id. WHEREFORE ¶ c(ii).

Under Minnesota procedure, adverse parties need not be named in a petition for trust instructions.   Instead, the petitioner must give notice to the trust's beneficiaries, who

may then appear as interested parties.  Minn. Stat. §§ 501B.18, 501B.21; see In re Trusteeship Created by Am. Home Mortgage Inv. Trust 2005-2, No. 14 Civ. 2494 (AKH), 2014 WL 3858506, at *12 (S.D.N.Y. July 24, 2014).  On October 7, 2013, Zions removed each action to the U.S. District Court for the District of Minnesota.  In its six apparently identical (but for their captions) notices of removal, Zions alleged that, as a "party in interest," it had standing to remove the action because it was "the beneficial owner of notes in four of the six . . . CDOs: Tropic I CDO, Tropic II CDO, Tropic CDO III, and Tropic CDO IV." Doc. 1, at ¶¶ 7-8.[6]  Zions did not allege that it had an interest in the Soloso 2005-1 or Soloso 2007-1 CDOs.  Zions alleged that the relief sought by the Trustee would "impact the distributions Zions Bank is entitled to receive as a noteholder" and that, if the court granted legal fees to the Trustee as the Trustee sought, it would "result in funds that would otherwise be available for distribution to Zions . . . being diverted to pay Wells Fargo's legal fees." Id. ¶¶ 9, 10.

Zions then moved to transfer the six actions to the U.S. District Court for the Southern District of New York, noting that the trust indentures were negotiated and drafted in New York and are governed by New York law.  Doc. 18, at 2; see,

---

[6] In its subsequent memorandum of law in support of transfer of the actions from the District of Minnesota to the Southern District of New York, Zions detailed its holdings in each of these four CDOs by class of note and face value.  Doc. 18, at 6.

e.g., Indenture § 13.10(a), at 92 ("This Indenture . . . shall be construed in accordance with and governed by the laws of the State of New York . . . ."). On the Trustee's consent, the Minnesota federal district court ordered the transfer of the six actions to this Court. Doc. 24. On January 14, 2014, this Court signed a stipulation of the Trustee and Zions consolidating the six transferred actions pursuant to Fed. R. Civ. P. 42(a). Doc. 31. On January 31, 2014, HRUN having come forward as an interested party, the Court permitted HRUN to intervene. Doc. 32.

On February 28, 2014, HRUN filed an Answer in which it "consents to the relief that the Trustee seeks." Doc. 34, at 9. On the same day, Zions filed an "Answer and Affirmative Claim to the Res." Doc. 35 ("Zions Ans." and "Zions Aff. Claim"). In this pleading, Zions alleges that it is an owner of $78 million in Tropic I notes. Zions Aff. Claim ¶¶ 1, 6; see also Zions Ans. ¶ 17. Zions also alleges that it "owns notes issued by the Tropic II CDO and the Tropic III CDO." Zions Aff. Claim ¶ 6. Zions alleges that it is entitled to a declaration approving its interpretation of the Senior Overcollateralization Test and related provisions of the Tropic I Indenture and an instruction to the Trustee to pay $4,931,044.90 plus interest from funds held back from Tropic I. Zions Aff. Claim WHEREFORE ¶¶ A, B.

On May 23, 2014, notice having been provided to other CDO noteholders and none having come forward, the Trustee, HRUN, and Zions each moved for judgment on the pleadings.  Docs. 41, 45, 50.  The motions were fully briefed on June 20, 2014.

## II.  DISCUSSION

Tropic I is the only CDO as to which we perceive an actual controversy among the parties to this litigation.  Given the implications of this for the Court's subject-matter jurisdiction, we address Tropic I separately from the other five CDOs.

## A.  Tropic I

The general principles applicable to judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) to the interpretation of contracts are familiar and not in dispute. "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988). "In evaluating a Rule 12(c) motion, the court must view the pleadings in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party." Madonna v. United States, 878 F.2d 62, 65 (2d Cir. 1989).

However, "[t]he Court need not accord '[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness.'" In re Bakery & Confectionary Union & Indus. Int'l Pension Fund Pension Plan, 865 F. Supp. 2d 469, 471-72 (S.D.N.Y. 2012) (quoting In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007)), aff'd sub nom. Alcantara v. Bakery & Confectionary Union & Indus. Int'l Pension Fund Pension Plan, 751 F.3d 71 (2d Cir. 2014).

The pleadings are "deemed to include any written instrument attached to [them] as an exhibit, materials incorporated in [them] by reference, and documents that, although not incorporated by reference, are integral to the complaint." Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) (citations and internal quotation marks omitted). If the allegations of a pleading "are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the [pleading]." Sazerac Co. v. Falk, 861 F. Supp. 253, 257 (S.D.N.Y. 1994); see, e.g., Feick v. Fleener, 653 F.2d 69, 75 & n.4 (2d Cir. 1981). Thus, a motion for judgment on the pleadings "can be particularly appropriate in breach of contract cases involving legal interpretations of the obligations of the parties." VoiceAge Corp. v. RealNetworks, Inc., 926 F. Supp. 2d 524, 529 (S.D.N.Y. 2013).

As noted above, the Indenture is to be construed according to New York law.  Under New York law, the interpretation of an unambiguous contract is a question of law to be addressed by the Court.  See Provident Loan Soc'y of N.Y. v. 190 E. 72nd St. Corp., 911 N.Y.S.2d 308, 309 (1st Dep't 2010).  So too is the determination of whether a contract provision is in fact ambiguous.  Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 178 (2d Cir. 2004) (citing W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990)).  A contract is ambiguous only if "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." Goldman Sachs Grp., Inc. v. Almah LLC, 924 N.Y.S.2d 87, 90 (1st Dep't 2011) (internal citation and quotation marks omitted); see also Broder v. Cablevision Sys. Corp., 418 F.3d 187, 197 (2d Cir. 2005) ("[A]mbiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and . . . is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (internal citation and quotation marks omitted)).  A contract is not ambiguous simply because the parties would construe it differently.  See Law Debenture Trust Co. of N.Y. v. Maverick

17

Tube Corp., 595 F.3d 458, 467 (2d Cir.2010); Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd., 88 N.Y.2d 347, 352 (1996).

In determining the meaning of a contract, this Court will "look to all corners of the document rather than view sentences or clauses in isolation." Int'l Klafter Co. v. Cont'l Cas. Co., 869 F.2d 96, 99 (2d Cir. 1989) (internal quotation marks omitted); see also Kass v. Kass, 91 N.Y.2d 554, 566 (1998). "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." W.W.W. Assocs., Inc., 77 N.Y.2d at 162. In other words, our "primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." Bolt Elec., Inc. v. City of New York, 223 F.3d 146, 150 (2d Cir. 2000).

As to Tropic I, the Trustee and Zions disagree on the manner in which, when making quarterly payments pursuant to Sections 11.1(c)(i)THIRD and 11.1(c)(ii)FIRST of the Indenture, the Trustee is required to calculate the "payment [to Senior Noteholders] of principal as an O/C Redemption in the amount, if any, required to be paid in order to satisfy the Senior Overcollateralization Test."[7]   As the Trustee explains its

---

[7] Although we do not perceive a basis to conclude that HRUN has standing to seek a judicial construction of the Tropic I Indenture, we have nonetheless considered its arguments.   None of those arguments, which are basically duplicative of those advanced by the Trustee, would lead us to question our conclusions herein.

"dynamic" approach to this problem, on the three Payment Dates
when the Senior Overcollateralization Test was failing (the
"Disputed Payment Dates"):

> the Trustee . . . calculated the O/C Redemption using
> the Annex A calculation. However, although **a single
> application of the Annex A Calculation**, and the
> resulting redemption of Senior Class A Notes,
> increased the Senior Overcollateralization Ratio on
> each of the Disputed Payment Dates, it **was
> insufficient to cause the Senior Overcollateralization
> Test to be satisfied, *i.e.*, the ratio did not increase
> to at least 106%**. . . .
>
> **The Trustee therefore applied the Annex A
> Calculation dynamically, so as to pay proceeds to
> Senior Class A Noteholders and redeem Senior Class A
> Notes by repeating the Annex A Calculations on each
> Payment Date so long as the Senior
> Overcollateralization Test remained unsatisfied
> (because the Senior Overcollateralization Ratio had
> not risen to 106%)** and cash Collections were not
> exhausted. . . .
>
> [This] dynamic application of the Annex A
> Calculation resulted in available interest and
> principal Collections being paid to [Senior
> Noteholders] (in redemption of [their] Notes), but the
> aggregate amount of such Collections were [<u>sic</u>]
> insufficient to satisfy the Senior
> Overcollateralization Test. . . . Thus, redemption of
> the Senior Class A Notes on each the Disputed
> Payment Dates left no Collections amounts available
> for payment . . . to [junior noteholders].

Trustee Br. at 8-9 (emphases added). Zions responds that the
Indenture does not contemplate dynamic application of the Annex
A Calculation, and that instead the Indenture unambiguously
provides that a single "payment of an 'O/C Redemption' in an
amount determined by the Annex A Formula is sufficient to remedy

19

a failure of the Senior Overcollateralization Test." Zions Br. at 10.

We agree with Zions. Upon failure of the Senior Overcollateralization Test, Section 11.1(c)(i)THIRD requires "an O/C Redemption in the amount . . . required to be paid in order to satisfy the Senior Overcollateralization Test." Indenture § 11.1(c)(i)THIRD, at 86. An "O/C Redemption" is defined as a redemption of notes "to the extent necessary such that the Overcollateralization Tests . . . are satisfied, such test to be calculated according to the method prescribed by Annex A." Indenture § 1.1, at 15 (underlining in original). Annex A, entitled "Methodology for Calculating the Amount of an O/C Redemption," describes the method that the Trustee shall use to calculate "the amount . . . to be applied . . . as an O/C Redemption . . . in order to satisfy such Overcollateralization Test(s)," including "the Senior Overcollateralization Test." Indenture Annex A, at B-1. Annex A describes that method as yielding an "O/C Redemption Amount." Id. (underlining in original). These provisions harmoniously indicate that the result of the Annex A Formula is the amount of an O/C Redemption to be made upon failure of the Senior Overcollateralization Test, in order to satisfy that test. Nothing in these provisions suggests that that anything more is required to

satisfy the Senior Overcollateralization Test or that the Annex A Formula should be repeated or otherwise applied "dynamically."

In arguing otherwise, the Trustee relies on language in the Indenture's Sections 9.2 and 11.1(c)(i)THIRD, and the definition of an "O/C Redemption" that contemplate a redemption in the amount necessary to "satisfy" the Senior Overcollateralization Test. The Trustee argues that Zions' position would effectively nullify these provisions, because (according to the Trustee) the Senior Overcollateralization Test cannot be satisfied until the Senior Overcollateralization Ratio is restored to 106%. A major flaw in this argument is that Annex A expressly describes the method by which to calculate the amount that will "satisfy" the Senior Overcollateralization Test. Accordingly, in the context of an O/C Redemption, the result of the method described by Annex A is the amount required to satisfy the Senior Overcollateralization Test.[8]

Similarly, the Trustee points out that Section 11.2 requires redemption in the amount "necessary to cause [the Senior Overcollateralization Test] to be met." But Section 11.2 expressly provides that the Trustee's redemption of notes shall

---

[8] The Trustee also argues that the Court should look to the dictionary definition of the term "to satisfy." But the definition that the Trustee offers -- "'to provide, do, or have what is required by [someone or something]' or 'to carry out the terms of,'" Trustee Reply Br. at 6 -- does not help decide whether the Annex A Formula should be applied just once or dynamically. Cf. Rosenthal v. Quadriga Art, Inc., 69 A.D.3d 504, 507 (1st Dep't 2010) ("the dictionary definition offered by plaintiff sheds no particular light on the intended meaning of the provision in question").

be done "pursuant to the applicable provisions of Section 11.1." As already discussed, Section 11.1 provides for redemption in the amount that results from application of the Annex A Formula. Thus, the Indenture's provisions can be reconciled even without the application of the "rule of construction that a specific contract provision should prevail over a general one," Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co., 762 F.3d 165, 179 (2d Cir. 2014), which would otherwise favor adherence to the detailed method for calculating the amount of an O/C Redemption that Annex A provides.

Most fundamentally, the Trustee's approach fails because it cannot be reconciled with the plain language of either Annex A or the Indenture when read as a whole.  The Trustee stresses that there is no provision in the Indenture that expressly prohibits a dynamic or repetitious application of the Annex A Calculation.  But we find it much more telling that there no provision that approves of such an approach.  The Indenture sets forth an intricate, specific approach for determining the amount of payments due to the various classes of noteholders at each step in the waterfall, including the detailed method in Annex A for calculating the amount of an O/C Redemption upon failure of an Overcollateralization Test.  If a dynamic approach were meant by the Indenture, it would be plainly described in the Indenture.  As Zions argues, "[i]f the drafters of the Indenture

had intended for the O/C Redemption to be calculated by reference to the amount required to ensure that the ratio of collateral to senior notes was 106% *following all distributions on the Payment Date*, they could easily have set forth a formula in Annex A that expressly provided for this result." Zions Br. at 12 (italics in original). Of course, the drafters did not do so. Any "dynamic" interpretation of the Indenture would either redefine or nullify Annex A and cause severe tension with the Indenture's other provisions. Thus, we agree with Zions that when the Senior Overcollateralization Test is failing as of a given Calculation Date, payment of an O/C Redemption in the amount determined by the Annex A Formula is sufficient to remedy a failure of that test.[9]

The Trustee argues that, should the Court agree with Zions' interpretation of the Indenture, the Court should defer setting the amount of Zions' entitlement to the held-back proceeds of Tropic I's liquidation, so that the Trustee may first attempt a calculation according to Zions' methodology. Trustee Br. at 21. Zions does not object to this sensible proposal. Accordingly, the Trustee and Zions are directed to confer and advise the

---

[9] The Trustee devotes significant emphasis to the purpose of the Senior Overcollateralization Test, which (as all parties agree) is to protect Senior Noteholders against the risk of default. But both interpretations of the Senior Overcollateralization Test are consistent with that purpose.

Court within two weeks as to whether further proceedings with respect to Tropic I will be required.[10]

## B.   The Other CDOs

It is axiomatic that the federal courts are vested with only limited subject-matter jurisdiction. Among the jurisdictional limitations imposed by the case or controversy of Article III of the Constitution is the requirement of "a substantial controversy, between parties having adverse legal interests." Port Wash. Teachers' Ass'n v. Bd. of Educ. of Port Wash. Union Free Sch. Dist., 478 F.3d 494, 501 (2d Cir. 2007) (internal quotation marks omitted); see, e.g., MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007). Here, aside from Tropic I, the Court does not perceive an actual controversy among parties with adverse legal interests.

In its "Affirmative Claim to the Res," Zions does not allege that Zions is entitled to any relief as to the five CDOs other than Tropic I, even though it alleges that it owns notes in Tropic II and Tropic III. Zions Aff. Claim ¶ 6. Zions does not even assert an interest in Tropic IV, Soloso 2005-1 or

---

[10] The memoranda of law submitted by the parties also do not address the merits of the Trustee's alleged entitlement to reimbursement of its fees and expenses incurred these proceedings. If the Trustee continues to assert such a claim, the parties should advise the Court if further proceedings will be required as to this issue.

Soloso 2007-1.[11]   HRUN has intervened in this litigation, and represents that it has holdings in Tropic III, Tropic IV, and Soloso 2005-1.  HRUN Br. at 1 & n.2.  However, HRUN supports the Trustee's interpretation of the Senior Overcollateralization Test.  Thus, HRUN is not adverse to the Trustee in any respect, and it is not self-evident that HRUN is adverse to Zions even with respect to Tropic III.  Nor is it apparent that Zions is adverse to the Trustee with respect to any of the six CDOs other than Tropic I.

As described in Part I.C above, this action was commenced as six separate state-court actions under a state statute that authorizes judicial instruction of trustees without any apparent requirement of adverse parties.  <u>See</u> Minn. Stat. § 501B.16. Such a power to supervise trusts and instruct their trustees is a common incident of a court of equity.  <u>See generally</u> Restatement (Third) of Trusts § 71 (2007).  Thus, it is understandable that the Minnesota legislature has conferred that power upon the Minnesota state courts of general jurisdiction. But although "it is a traditional judicial office to give instructions to trustees who have substantial questions

---

[11]   In removing this litigation -- which at the time comprised six separate state-court proceedings -- to federal court, and in moving to transfer the litigation to this Court, Zions represented that it had an interest in the Tropic I, Tropic II, Tropic III, and Tropic IV CDOs.  Doc. 1, at ¶ 8; Doc. 18, at 6.  However, in its later-filed Affirmative Claim, Zions alleges only that it had an interest in Tropic I, Tropic II, and Tropic III. Zions Aff. Claim ¶ 6.

concerning their duties, . . . . it is arguable that unless there is an actual controversy between trustee and beneficiary, or the conditions for an interpleader are present, a federal court has no power to instruct the trustee on his duties." First Nat'l Bank of Chi. v. A.M. Castle & Co. Emp. Trust, 180 F.3d 814, 819 (7th Cir. 1999).  To the extent that there is no actual controversy, there can be no constitutional basis for this Court to exercise jurisdiction.

"When a case has been removed from state court to federal court, '[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.'"   Vossbrinck v. Accredited Home Lenders, Inc., 773 F.3d 423, 427 (2d Cir. 2014) (quoting 28 U.S.C. § 1447(c)).  The Court is doubtful that there is (or ever was) a basis for federal subject-matter jurisdiction over some of the petitions originally filed in Minnesota state court. Accordingly, we are inclined to sever the non-Tropic I cases pursuant to Fed. R. Civ. P. 42(b) and remand them to state court.

Nonetheless, since the parties have not briefed this jurisdictional issue, we invite an explanation of any basis for federal subject-matter jurisdiction.  Any party wishing to argue for the existence of jurisdiction over the non-Tropic I

petitions may submit a letter brief not to exceed four pages within two weeks.  Any opposition will be due one week later.

## CONCLUSION

For the foregoing reasons, Zions' motion for judgment on the pleadings (Doc. 50) is granted with respect to Tropic I to the extent that the Court endorses Zions' interpretation of the contested provisions of the Tropic I Indenture.  Wells Fargo's motion for judgment on the pleadings (Doc. 41) is denied on the merits with respect to to Tropic I.  The Court reserves judgment on the amount of distribution to which Zions is entitled.  Wells Fargo and Zions are directed to confer and to advise the Court by March 27, 2015, as to whether further proceedings will be required as to Tropic I.

Wells Fargo's motion is denied with respect to the other CDOs for apparent lack of federal subject-matter jurisdiction.  HRUN's motion for judgment on the pleadings (Doc. 45) is denied in full for apparent lack of federal subject-matter jurisdiction.  Any party wishing to contend that the Court should not sever the proceedings with respect to the five CDOs other than Tropic I and remand those proceedings to Minnesota state court may submit a letter brief not to exceed four pages by March 27, 2015.  Any opposition will be due by April 3, 2015.

**IT IS SO ORDERED.**

Dated:    New York, New York
          March 13, 2015

                              NAOMI REICE BUCHWALD
                              UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

**Attorneys for Wells Fargo Bank, N.A.**

Michael E. Johnson, Esq.
Carolyn R. O'Leary, Esq.
Alston & Bird LLP
90 Park Avenue
New York, NY 10016

**Attorneys for HRUN LLC**

Lisa C. Cohen, Esq.
Richard J. Bettan, Esq.
Schindler Cohen & Hochman LLP
100 Wall Street, 15th Floor
New York, NY 10005

**Attorneys for Zions Bancorporation**

Jonathan E. Pickhardt, Esq.
Andrew S. Corkhill, Esq.
Blair Adams, Esq.
51 Madison Avenue, 22nd Floor
New York, NY 10010